Jack M. Burr and Myn Burr v. Commissioner. Emerald Plastics Corp. (a New York corporation) v. Commissioner.Burr v. CommissionerDocket Nos. 3063-64, 3066-64.United States Tax CourtT.C. Memo 1966-112; 1966 Tax Ct. Memo LEXIS 168; 25 T.C.M. (CCH) 592; T.C.M. (RIA) 66112; May 27, 1966Eugene O. Cobert, 41 East 42nd St., New York, N. Y., for the petitioners. James Q. Smith and Charles G. Barnett, for the respondent. RAUMMemorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions to tax for fraud, as follows: Additions to Tax,YearIncomeSec. 6653(b),EndedTaxI.R.C. 1954Jack M. Burr and Myn Burr12-31-55$11,973.85$5,986.9312-31-5619,521.999,761.0012-31-577,068.463,534.2312-31-5815,889.427,944.71Emerald Plastics Corp.5-31-555,200.732,600.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,215.289,607.645-31-577,623.273,811.635-31-588,918.994,459.50*169 The questions presented are: (1) Were sales of plastics to Equality Plastics Corporation during the taxable years made by Emerald Plastics Corporation or by its sole stockholder, Jack M. Burr? (2) Did the Commissioner err in determining the amount of profit from such sales which was includable in the taxable income of the seller during the taxable years? (3) If Emerald Plastics Corporation was the seller, did Jack M. Burr receive taxable income from it which was not reported in his returns for the years 1955 through 1958? (4) Did the Commissioner err in disallowing deductions of $1,000 claimed for capital losses and capital loss carryovers in the joint returns of Jack and Myn Burr for the years 1955 through 1958? (5) Did the Commissioner err in disallowing the sick pay exclusion of $2,160 claimed by Jack and Myn Burr in their joint return for the year 1958? (6) Did the Commissioner err in disallowing all or part of the amounts claimed as deductions by Jack and Myn Burr in their returns for the years 1955 through 1958 for contributions, interest, taxes, medical expenses, travel expenses, and dues and subscriptions? (7) Did the Commissioner err in failing to allow Jack*170 and Myn Burr a deduction of $2,500 for legal fees paid on November 19, 1958? (8) Did the Commissioner err in determining that Emerald Plastics Corporation was liable for a 50 percent addition to tax for fraud under Section 6653(b) of the Internal Revenue Code of 1954 for each of the fiscal years ended May 31, 1955 through May 31, 1958? (9) Did the Commissioner err in determining that Jack and Myn Burr were liable for a 50 percent addition to tax for fraud under Section 6653(b) of the Internal Revenue Code of 1954 for each of the calendar years 1955 through 1958? The Commissioner concedes that Jack and Myn Burr sustained a loss of $2,525 on the sale of real property in 1958, as reported in their return for that year, and that he erred in determining that they realized a short-term capital gain of $4,000 on that sale. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Jack M. Burr and Myn Burr, husband and wife, are residents of White Meadow Lake, New Jersey. They filed joint income tax returns on the cash basis for the calendar year 1955 with the district director*171 for the Brooklyn District of New York, for the calendar years 1956 and 1957 with the district director for the Manhattan District of New York, and for the calendar year 1958 with the district director for (what is now) the Newark District of New Jersey. Jack M. Burr will sometimes hereinafter be referred to as Burr. During the years 1954 through 1957 Burr had a checking account at the Manufacturers Trust Company and a savings account at the Bowery Savings Bank, and Myn Burr had a checking account at the Sterling National Bank & Trust Company. Harjax Corporation (hereinafter referred to as Harjax) was organized under the laws of the State of New York on or about February 4, 1948 to engage in the manufacture of closet accessories. Burr and Harry Adler each invested $7,500 in the corporation, and they became the owners of its stock. Burr was its president and sales manager, and Adler its secretary and treasurer. Prior to November 15, 1954, Burr received a regular salary from Harjax, and devoted practically his full time to the business of the corporation. Emerald Plastics Corporation (hereinafter sometimes referred to as Emerald) was organized under the laws of the State of New*172 York on June 11, 1949 to handle mail orders of products produced by Harjax. After it was organized a checking account was opened in its name at the Manufacturers Trust Company in New York. On or about April 22, 1955, another checking account was opened in its name at the Commercial State Bank and Trust Co. of New York (hereinafter referred to as the Commercial State Bank). Prior to November 15, 1954, Burr and Harry Adler each owned 50 percent of Emerald's stock. Emerald and several other enterprises in which Burr had an interest occupied the same office space. It did not maintain any books of account other than a checkbook, and did not file Federal income tax returns for the calendar years 1955 through 1958 or for any fiscal year ending within any of those years. The parties have agreed that for Federal income tax purposes its taxable year is a fiscal year ending May 31. On October 28, 1953, Burr borrowed $3,500 and $2,473.12 from the Sterling National Bank & Trust Company on two separate time payment loans. Of the proceeds of these loans, Burr deposited to the account of Harjax $2,709.30 and $2,300, respectively, or an aggregate of $5,009.30. On November 15, 1954, the amount owing*173 by Burr on these loans was $3,000. In April 1954, Burr had a heart attack and was taken to the Forest Hills General Hospital where he stayed for a period of approximately seven weeks. He did not return to work at Harjax, on the advice of doctors, until October, 1954. At that time the condition of the business of Harjax was "poor" and he decided to dispose of his interest in that corporation. On November 15, 1954, Burr sold all of his Harjax stock to Adler, and Adler transferred all of his Emerald stock to Burr. Emerald then had $292.72 in its bank account at the Manufacturers Trust Company. The sale by Burr to Adler of his stock of Harjax was made pursuant to the terms of an agreement entered into on November 15, 1954 between the Burrs, Adler and Harjax. Therein Harjax agreed to pay Burr the balance of $3,000 which Burr then owed to the Sterling National Bank and Burr agreed to pay that amount to the bank; Burr agreed to assign to Adler all claims which he had against Harjax including any monies owing by Harjax to Burr; and Burr, Adler and Harjax agreed to give each other releases. The $3,000 balance was paid by Harjax to Burr and was deposited by him in his personal account*174 at the Manufacturers Trust Company on November 16, 1954. The agreement also provided that in the event Harjax was actively engaged in business on the first anniversary date of the agreement, Adler would pay Burr $1,000, and in the event it was actively engaged in business on the second anniversary date of the agreement, Adler would pay Burr an additional $1,000. Burr subsequently received two $1,000 payments from Adler. In a joint income tax return filed by Burr and his wife for the year 1954, they reported salary received by Burr from Harjax in the amount of $5,050, and a tax withholding on that salary of $540.60. As of December 31, 1954, the balance in Burr's account at the Manufacturers Trust Company amounted to $2,310.11, the balance in Burr's account at the Bowery Savings Bank $435.12, the balance in Myn Burr's account at the Sterling National Bank $3,101.86, and the balance in Emerald's account at the Manufacturers Trust Company $288.72. In the latter part of 1954, after his illness, Burr did not engage in any busines activity. Arnold Mandell, a friend of long standing, permitted him to use one of the offices of Remington Associates, Inc., a corporation apparently controlled*175 by Mandell. In December of 1954 Burr met a person named David Wiener on the street; Wiener told Burr that he knew someone who had plastics which Burr could sell at a profit, but that Burr would have to pay cash in advance for this merchandise. The merchandise consisted of vinyl plastics in roll or sheet form which were classified as irregulars because of changes in color or lack of uniformity in thickness. Burr ascertained that Equality Plastics Corporation (hereinafter referred to as Equality Plastics), the president of which was Harold Richards, was interested in buying such merchandise whenever it was available. During the years 1955 through 1958 plastics purchased from or through Wiener were sold to Equality Plastics. Whenever plastic "irregulars" became available Burr would receive a phone call from Wiener, who would tell Burr the price he wanted for the merchandise per pound or per yard. Burr would then communicate with Richards to find out if Equality Plastics could use the material at the price which Burr quoted to him. When Richards indicated that it could, Burr would call Wiener, pay him cash in advance for the merchandise, and arrange for its delivery to Equality Plastics. *176 After delivery was made Burr would send Equality Plastics an Emerald Plastics Corp. invoice which contained a statement of the merchandise delivered and the amount due therefor. When the invoice was received, Richards, who understood that Burr was representing Emerald, would send a check of Equality Plastics payable to Emerald for the amount due. This check would be received within a period of "not more than several days, two or three days" from the time payment of the merchandise was made to Wiener. All checks received for plastics sold to Equality Plastics were deposited in Emerald's account at the Manufacturers Trust Company. During the years ended May 31, 1955, 1956, and 1957, Emerald received some income from testing certain plastic products "mail order-wise", and receipts from this business were deposited in its account at the Commercial State Bank, which had been opened in 1955 for that purpose, thus leaving its account at the Manufacturers Trust Company for use in connection with the sales of plastics to Equality Plastics without commingling the two activities. In New York Franchise Tax Returns filed by Emerald it reported a net loss of $67.30 from this mail order business*177 for the year ended May 31, 1955, a net profit of $20.16 for the year ended May 31, 1956, and a net loss of $73.87 for the year ended May 31, 1957. In determining the deficiencies asserted against Emerald, the Commissioner determined that it realized unreported taxable income for the taxable years ended May 31, 1955 through May 31, 1958 in the amounts of $17,335.77, $47,529.38, $25,237.05 and $27,728.83, respectively, computed as follows: Taxable Year EndedMay 31,May 31,May 31,May 31,1955195619571958Sales$26,882.52$69,929.88$32,612.05$39,620.56Less: Cost of goods sold9,536.7521,800.007,375.0011,884.08Gross profit$17,345.77$48,129.88$25,237.05$27,736.48Expenses10.00600.507.65Taxable income$17,335.77$47,529.38$25,237.05$27,728.83During the fiscal year ended May 31, 1955, sales of plastics made by Emerald to Equality Plastics, and the dates on which the proceeds of those sales were deposited in Emerald's account at the Manufacturers Trust Company, were as follows: Deposits in EmeraldSales to EqualityMfrs. Tr. Co. Acct.DateAmountDateAmount1- 6-55$ 2,749.501-11-55$ 2,749.501-20-552,520.001-31-552,520.002-25-552,806.403- 4-552,806.403- 5-552,829.203-16-552,829.203-16-553,250.003-25-553,250.004- 6-553,150.004-13-553,150.004-15-552,079.704-16-552,253.304-27-554,333.005- 7-552,144.455- 9-552,184.355-19-554,328.80Total$25,966.90$25,966.90*178 The following checks, payable to cash and signed by Burr, were drawn on Emerald's account at the Manufacturers Trust Company during the period January 1, 1955 to May 31, 1955: Date of WithdrawalAmountJan. 3, 1955$ 50.00Jan. 31, 19551,400.00Mar. 4, 19552,600.00Mar. 15, 1955$2,800.00Mar. 25, 19552,850.00Apr. 8, 19553,200.00Apr. 27, 19553,900.00May 3, 19551,100.00May 19, 19553,200.00May 25, 19551,100.00Included in the amounts withdrawn from Burr's checking account at the Manufacturers Trust Company during the period January 1 to May 31, 1955 were the following: Date of WithdrawalAmountJan. 11, 1955$2,100.00Feb. 28, 19551,000.00Apr. 26, 1955700.00May 19, 1955700.00The following is a summary of the deposits to, and withdrawals from, Emerald's account at the Manufacturers Trust Company for the fiscal year ended May 31, 1955: DateExplanation of ItemAmountBalance in account, June 1, 1954$ 676.51Deposits of proceeds of sales to Equality25,966.90Unidentified deposits117.09Transfer from Burr's personal account (loan)700.00Total$27,460.50Withdrawals: Cash withdrawals19,123.50Transfer to Burr's personal account3,076.50Transfer to Myn Burr 1-11-551,100.00Bank charges10.001-13-55American Air Lines94.272-10-55Witty Bros.124.102- -55Huston Stationery & Printers11.33Misc.Unidentified payees563.46Total Withdrawals$24,103.16Balance in Bank, May 31, 1955$ 3,357.34*179 Emerald realized taxable income in the amount of $5,700 from sales of plastics to Equality Plastics during its fiscal year ended May 31, 1955. During the fiscal year ended May 31, 1956, sales of plastics made by Emerald to Equality Plastics, and the dates on which the proceeds of those sales were deposited in Emerald's account at the Manufacturers Trust Company, were as follows: Deposits in EmeraldSales to EqualityMfrs. Tr. Co. Acct.DateAmountDateAmount6- 9-55$ 4,330.006-20-55$ 4,330.007- 2-551,824.907- 5-552,651.957-14-554,476.857-22-552,069.207-22-552,390.508- 3-554,459.709-20-554,510.109-30-554,510.1010-18-555,947.0010-28-555,947.001-25-562,027.101-27-564,091.902-15-566,119.002-21-56$ 5,096.003-21-56$ 5,096.002-23-563,252.353- 2-563,252.352-26-563,156.302-26-563,410.003-26-566,566.304- 9-565,045.704-19-565,045.705-28-566,536.005-28-566,536.00Total$56,339.00$56,339.00The following checks, payable to cash and signed by Burr, were drawn on Emerald's account at the Manufacturers Trust Company during the fiscal year ended*180 May 31, 1956: Date of WithdrawalAmountJune 16, 1955$3,200.00June 29, 19551,100.00July 14, 19552,800.00July 21, 19551,600.00Aug. 3, 19552,800.00Aug. 9, 19551,600.00Aug. 25, 1955$2,800.00Aug. 30, 19554,200.00Sept. 29, 19552,800.00Oct. 5, 19551,700.00Oct. 28, 19553,000.00Nov. 1, 19552,900.00Feb. 15, 19561,000.00Feb. 29, 19565,000.00Mar. 8, 19563,500.00Mar. 26, 19565,300.00Apr. 18, 19566,000.00May 15, 19562,000.00May 22, 19563,500.00May 25, 19563,000.00Included in the amounts withdrawn from Burr's checking account at the Manufacturers Trust Company during the fiscal year ended May 31, 1956, were the following: Date of WithdrawalAmountJuly 14, 1955$1,200.00Aug. 3, 19551,200.00Aug. 25, 19551,300.00Sept. 29, 19551,200.00Oct. 28, 19551,000.00Dec. 20, 19551,000.00Feb. 14, 19561,000.00May 24, 19562,900.00The following is a summary of the deposits to, and withdrawals from, Emerald's account at the Manufacturers Trust Company for the fiscal year ended May 31, 1956: DateExplanation of ItemAmountBalance in account, June 1, 1955$ 3,357.34Sales to Equality56,339.00Unidentified deposits8,256.18Total$67,952.52Withdrawals: Cash withdrawals44,900.00Transfer to Burr's personal account14,900.006-30-55Bazaar Novelty Inc.500.008-30-55Novel Mfg. Co.1,200.0010-31-55Sterling Nat. Bank (Burr personal loan248.89payment)1-12-56I. B. West & Co.1,500.002-20-56I. B. West & Co.500.004- 3-56I. B. West & Co.950.00Total Withdrawals$64,698.89Balance in Bank, May 31, 1956$ 3,253.63*181 Emerald realized taxable income in the amount of $12,400 from sales of plastics to Equality Plastics during its fiscal year ended May 31, 1956. During the fiscal year ended May 31, 1957, sales of plastics made by Emerald to Equality Plastics, and the dates on which the proceeds of those sales were deposited in Emerald's account at the Manufacturers Trust Company, were as follows: Deposits in EmeraldSales to EqualityMfrs. Tr. Co. Acct.DateAmountDateAmount9- 5-56$ 6,189.129-11-56$ 6,189.1210- 3-564,900.0010- 5-564,900.0011-30-565,735.0012-10-565,735.0012-28-566,496.0012-28-566,496.004-29-575,433.004-30-575,433.00Total$28,753.12$28,753.12The following checks, payable to cash and signed by Burr, were drawn on Emerald's account at the Manufacturers Trust Company during the fiscal year ended May 31, 1957: Date of WithdrawalAmountSept. 11, 1956$3,000.00Sept. 14, 19563,000.00Oct. 3, 19563,000.00Oct. 19, 19561,900.00Dec. 10, 1956$3,000.00Dec. 14, 19562,800.00Dec. 28, 19563,000.00Jan. 3, 19573,500.00Feb. 19, 1957250.00Apr. 30, 1957500.00May 14, 19575,000.00*182 Included in the amounts withdrawn from Burr's checking account at the Manufacturers Trust Company during the fiscal year ended May 31, 1957, were the following: Date of WithdrawalAmountJune 1, 1956$1,500.00July 12, 19561,000.00July 16, 19561,000.00July 19, 1956800.00Aug. 22, 19562,400.00Sept. 11, 19562,500.00Oct. 2, 19563,000.00Nov. 15, 19565,000.00Dec. 10, 19562,000.00Dec. 24, 19561,000.00Dec. 28, 19562,500.00Jan. 4, 19571,000.00Jan. 11, 19571,100.00May 8, 1957600.00May 16, 19575,000.00The following is a summary of the deposits to, and withdrawals from Emerald's account at the Manufacturers Trust Company for the fiscal year ended May 31, 1957: DateExplanation of ItemAmountBalance in account, June 1, 1956$ 3,253.63Sales to Equality28,753.12Total$32,006.75Withdrawals: Cash withdrawals$14,650.00Transfer to Burr's personal account14,300.0012-20-56Novel Mfg. Co.325.001-21-57Arnold A. Mandell300.00Total Withdrawals$29,575.00 *Balance in Bank, May 31, 1957$ 2,431.75* Stipulation page 8 erroneously shows this amount as $29,975.00. Emerald realized taxable income in the amount of $6,300 from sales of plastics to Equality Plastics during its fiscal year ended May 31, 1957. During the fiscal year ended May 31, 1958, the sales of plastics made by Emerald to Equality Plastics, and the dates on which the proceeds of those sales were deposited in the account of Emerald at the Manufacturers Trust Company, were as follows: Deposits in EmeraldSales to EqualityMfrs. Tr. Co. Acct.DateAmountDateAmount12- 2-57$ 5,818.4012-10-57$ 5,818.401- 3-585,995.201- 3-585,995.202-26-586,525.602-26-586,525.603-24-584,808.003-24-584,808.004- 2-588,659.604- 2-588,659.604-30-586,656.804-30-586,656.80Total$38,463.60$38,463.60Cash withdrawals of $1,000 on July 17, 1957, $2,000 on September 30, 1957, and $350 on December 10, 1957 were made from Emerald's account at the Manufacturers Trust Company, and these amounts were deposited on those dates in Burr's account at the same bank. Another withdrawal in the amount of $5,500 was made on December 16, 1957. Emerald's account at the Manufacturers Trust Company, which was introduced in evidence, covers the period January 1, 1954 through December 16, 1957. It does not show deposits or withdrawals subsequent to December 16, 1957. The balance in the account on that date was $550.15. The checking account of Burr at the Manufacturers Trust Company introduced in evidence does not show deposits or withdrawals made subsequent to December 27, 1957. Withdrawals were made from this account in the amount of $2,500 on June 24, 1957 and $3,250 on October 1, 1957. The balance in this account as of December 27, 1957 was $530.97. Emerald realized taxable income in the amount of $8,400 from sales of plastics to Equality Plastics during its fiscal year ended May 31, 1958. Income of Jack and Myn Burr. In the joint returns filed by Burr and his wife for the calendar years 1955 through 1958, the receipt of the following salaries and other income received by Burr was reported: 1955195619571958Remington Associates, Inc.$3,600.00$5,200.00$5,200.00$10,580.00Arnold A. Mandell Corp.5,200.005,200.005,300.00Drugs Plus, Inc.2,600.001,500.00Lloyd Owens Drug Co., Inc.1,800.003,900.00Fisk Research, Inc.4,500.00Slimtown, Inc.4,000.00Delbues Corp.550.00Madison Seventy-Fifth220.00National Trading Co.451.52 There was also reported in those returns "Commissions" purportedly received by Burr on sales of plastics to Equality Plastics in the amount of $2,800 for 1955, $1,500 for 1956, $2,500 for 1957, and $1,300 for 1958, and small amounts of interest. The Commissioner determined that they received additional taxable income in the amount of $32,651.73 for 1955, $41,849.87 for 1956, $13,740.17 for 1957, and $22,165.77 for 1958. The balance in Emerald's account at the Manufacturers Trust Company was $288.72 at the end of 1954, $2,888.28 at the end of 1955, $6,548.75 at the end of 1956, and $550.15 at the end of 1957. The proceeds of sales of plastics by Emerald to Equality Plastics which were deposited in that account amounted to $49,690.55 in 1955, $55,935.47 in 1956, $11,251.40 in 1957, and $32,645.20 in 1958. Cash withdrawals from that account which were deposited in Burr's account at the Manufacturers Trust Company amounted to $12,676.50 in 1955, $11,870 in 1956, and $12,100 in 1957. On January 11, 1955, a check in the amount of $1,100, payable to Myn Burr and signed by Burr, was drawn on Emerald's account at the Manufacturers Trust Company. On October 31, 1955 a payment of $248.89 was made on Burr's loan at the Sterling National Bank by check drawn on Emerald's account, signed by Burr. During the year 1956 Emerald made loans to I.B. West & Co. in the amount of $1,500 on January 12, 1956, $500 on February 20, 1956, and $950 on April 3, 1956. Checks for the amounts of these loans were drawn on Emerald's account at the Manufacturers Trust Company. Checks were received from I.B. West & Co. in repayment of these loans in 1956. Two of these checks, one in the amount of $300 and the other in the amount of $700, were deposited in Burr's savings account at the Bowery Savings Bank. On October 19, 1956, a check in the amount of $1,900, payable to cash, signed and endorsed by Burr, was drawn on Emerald's account at the Manufacturers Trust Company. On January 21, 1957, a check in the amount of $300, payable to Arnold A. Mandell Corporation and signed by Burr, was drawn on Emerald's account at the Manufacturers Trust Company. Burr and Arnold A. Mandell owned the stock of Arnold A. Mandell Corporation. Burr received dividend income from Emerald in the amount of $8,000 during the calendar year 1955, $7,800 during the calendar year 1956, $7,500 during the calendar year 1957, and $7,000 during the calendar year 1958. Capital Loss Deductions. In the joint return of Jack and Myn Burr for the year 1954, they reported a long term capital loss of $7,500 from Burr's investment in the stock of Harjax, a long term capital gain of $306.15 on the sale of 100 shares of "Peace River", and a net long term capital loss of $7,193.85; they claimed a capital loss deduction of $1,000. In their income tax return for the year 1955 they reported an unused capital loss carryover from the year 1954 of $6,500, and claimed a capital loss deduction of $1,000. In their income tax return for the year 1956, they reported an unused capital loss carryover of $5,193.85 and a capital loss "on loan to corp." of $16,500, and claimed a capital loss deduction of $1,000. In 1956 Burr made an investment of $2,500 in Fashion Tresses, Inc. which sold artificial hair pieces. In 1957 this corporation had no assets and its business was terminated, and Burr sustained a capital loss of $2,500. In the return of Burr and his wife for 1957, they reported this loss and an unused capital loss carryover from preceding years of $20,693.85, and claimed a capital loss deduction of $1,000. In their return for 1958 Burr and his wife reported an unused capital loss carryover from preceding years of $22,193.85, and claimed a capital loss deduction of $1,000. In determining the deficiencies respondent disallowed the deductions of $1,000 for capital losses claimed by Jack and Myn Burr in their returns for the years 1955 through 1958, for lack of substantiation. Excludable Sick Pay. In their joint return for the year 1958, Burr and his wife claimed a sick pay exclusion of $2,160. In 1958 Burr was an employee and stockholder of Remington Associates, Inc., and received from it a salary of $10,580 which, as already noted, was reported in the joint return filed by him and his wife. On April 7, 1958, Burr had a heart attack and entered Beth Israel Hospital. He was hospitalized for a period of approximately six weeks, and was discharged from the hospital on May 16, 1958. Thereafter he stayed at home for a period of approximately six six weeks to convalesce, and returned to work on July 7, 1958. Remington Associates, Inc. did not have a formal wage continuation plan, but it continued to pay Burr his salary of "around 200 some-odd dollars a week" during the period of approximately 12 weeks he was absent on account of illness. Itemized deductions. In their returns for the years 1955 through 1958 Burr and his wife claimed the following deductions: 1955195619571958Contributions$400.00$ 786.00$ 930.00$ 930.00Interest373.971,305.601,279.591,013.75Taxes507.24978.671,161.671,659.52Medical expenses541.20782.451,254.342,443.92Travel expenses1,600.002,325.00Dues and subscriptions15.00In determining the deficiencies, the Commissioner disallowed the claimed deductions, in whole or in part, for lack of substantiation, as follows: 1955195619571958Contributions$340.00$786.00$930.00$ 930.00Interest71.45671.93281.20150.17Taxes123.99478.39370.58176.14Medical expenses541.20782.45653.611,173.54Dues and subscriptions15.00 The Commissioner also disallowed deductions for travel expenses claimed in the amount of $1,600 for 1957 and $2,325 for 1958 on the ground that they did not represent ordinary and necessary business expenses. Inasmuch as the amounts allowed by the Commissioner for contributions, interest, taxes, and medical expenses for the year 1955 were less than $1,000, he allowed the Standard Deduction of $1,000 in lieu of specific deductions for that year. During the years 1957 and 1958, Burr made the following expenditures which entitle him and his wife to deductions in excess of those allowed by the Commissioner: 19571958Contributions - White MeadowLake Temple$450.00$680.84Real estate taxes688.80Interest on mortgage loan948.19In the year 1958, Burr paid real estate taxes amounting to $688.80. In determining the allowable deduction for taxes for that year the Commissioner allowed a deduction for real estate taxes of $654.66. Legal expense. On November 19, 1958, Burr paid Liebowitz, Cobert & Deixel $2,500 for legal services rendered to him in connection with "this case". No deduction therefor was claimed on the return filed by Burr and his wife for 1958, nor was any issue raised in the pleadings herein claiming any deduction in respect of this payment. Fraud. Part of the underpayment of tax required to be shown on income tax returns of Emerald for each of the fiscal years ended May 31, 1955, through May 31, 1958 was due to fraud. Part of the underpayment of tax required to be shown on the income tax returns of Jack and Myn Burr for each of the calendar years 1955 through 1958 was due to fraud. Opinion RAUM, Judge: Gain on sales taxable to Emerald. In determining that Emerald was liable for deficiencies in tax for the fiscal years ended May 31, 1955 through May 31, 1958, and that Jack and Myn Burr were liable for deficiencies in tax for the calendar years 1955 through 1958, the Commissioner has included in the income of each the profits which he determined were realized during the taxable years from sales of plastics to Equality Plastics. His position in this respect is intended to be in the alternative. He does not contend that such profits are includable directly in the taxable income of both Emerald and the individual petitioners. Indeed, he concedes that if it is determined that Emerald is accountable for these profits, they may not be attributed as such to the Burrs; but it is his further position that to the extent that such earnings were withdrawn from Emerald or diverted by Burr to his personal use the individual petitioners are chargeable with unreported dividend income in the years 1955-1958. The first question for decision is, therefore, whether the profit on the sales to Equality Plastics represented taxable income realized by Emerald or taxable income realized by Burr. Prior to November 15, 1954, the stock of Emerald, which was then engaged in making mail order sales for Harjax, was owned by Burr and Harry Adler. On November 15, 1954, Burr transferred his Harjax stock to Adler, and at the same time received Adler's stock in Emerald. He thus became the sole stockholder in Emerald. Emerald at that time had a bank account at the Manufacturers Trust Company with a balance of $292.72. However, Burr did not thereafter use that account for Emerald's mail order business, and in April 1955 he opened an account for Emerald at the Commercial State Bank and Trust Co. for use in Emerald's mail order activities. The reason for this was that Burr had already begun to use Emerald's account at the Manufacturers Trust Company in connection with the profitable sales of plastics to Equality Plastics, and wished to keep these activities separate. Beginning in 1955 and continuing through 1958, Burr arranged for purchases of plastics from or through David Wiener and those plastics were sold to Equality Plastics. The proceeds of those sales were deposited in Emerald's account at the Manufacturers Trust Company, and checks payable to cash were drawn on that account to pay for plastics purchased. Equality Plastics was billed for plastics sold to it on invoices of Emerald, and it paid for this merchandise with checks payable to Emerald. The president of Equality Plastics testified that, although he dealt with Burr in making purchases of plastics on behalf of Equality Plastics, he understood that Burr represented Emerald in these transactions. This and other evidence contained in the record convinces us that during the years 1955 through 1958 Burr was acting on behalf of his wholly-owned corporation, Emerald, when he purchased plastics and sold them to Equality Plastics. Having chosen the corporate form in which to conduct this business, he and his wholly-owned corporation must accept the tax disadvantages which result from the conduct of business in its name. Commissioner v. Moline Properties, 131 F. 2d 388, 389 (C.A. 5), affirmed 319 U.S. 436; Ralph B. Wattley, 31 T.C. 510, 521, affirmed in this respect, 275 F. 2d 461, 465 (C.A. 2), certiorari denied, 364 U.S. 864. In the circumstances, we hold that the gain realized on the sales of plastics to Equality Plastics during the fiscal years ended May 31, 1955 through May 31, 1958 is taxable income which should have been reported by Emerald. Amount of profits realized by Emerald on sales of plastics. In the notice of deficiencies mailed to Emerald, the Commissioner determined that it received taxable income in the amount of $17,335.77 for the fiscal year ended May 31, 1955, $47,529.38 for the fiscal year ended May 31, 1956, $25,237.05 for the fiscal year ended May 31, 1957, and $27,728.83 for the fiscal year ended May 31, 1958. Petitioners had the burden of proving that the Commissioner erred in this determination. During the fiscal years involved Emerald's business consisted of making a small amount of mail order sales, and of making a substantial amount of sales of plastics to Equality Plastics. New York State Franchise tax returns filed by Emerald for the years ended May 31, 1955 through May 31, 1957 convince us that no profit was realized in two of these years from that portion of its business involving mail order sales; and a profit of only $20 from that portion of its business in the remaining year. The question to be decided, therefore, is whether petitioners have sustained their burden of proving that the profit realized by Emerald from its sales of plastics to Equality Plastics was less than the amounts which the Commissioner included in its income for the taxable years. Burr testified that when he made purchases of plastics from or through Wiener, he added one or two cents per pound or per yard to the price paid to Wiener for such plastics; that the weight of the material had a bearing upon whether it was billed per pound or per yard; that the heavier material was sold by the yard; that the markup of one or two cents per pound or per yard represented the profit realized; that he kept a record of the profit on each transaction "in a little book"; and that at the end of each year he reported as "commissions" the total profit recorded in the book in the joint return filed by him and his wife. He also testified that he tried to find the book without success. In those joint returns he reported the receipt of "commissions" of $2,800 in 1955, $1,500 in 1956, $2,500 in 1957, and $1,300 in 1958, and petitioners contend that these amounts represent the profits realized on sales of plastics to Equality Plastics during those years. We are not convinced by Burr's testimony, or any other evidence in the record, that the amounts reported as "commissions" represent all of the profit realized on sales of plastics to Equality Plastics. We did not have confidence in Burr's credibility as a witness, and we formed the distinct impression that he understated the amount or measure of the profits realized in these transactions. Nevertheless, we are not convinced that the profits on these sales were as large as the income attributed to Emerald by the Commissioner. Based on the materials before us we are satisfied that the cost of these sales was greater than is reflected in the Commissioner's determination, with the consequence that the profit therefrom must be reduced. The matter is not susceptible of any precise mathematical determination, for the actual cost of each sale is nowhere shown in the record. Yet, there is evidence that enables us to form a judgment as to such costs. Emerald's purchases from or through Wiener were made for cash, and the amount withdrawn from Emerald's or Burr's bank accounts immediately prior to some of those purchases furnishes some guide as to cost of such purchases and thus establishes a basis for determining an approximate margin of profit on re-sale to Equality Plastics. Based on this and other evidence of record, and doing the best we can with the materials before us, we have found as facts that Emerald realized taxable income from sales of plastics to Equality Plastics in the amounts of $5,700, $12,400, $6,300, and $8,400 in its fiscal years ending May 31, 1955 through 1958, respectively. Cf. David J. Pleason, 22 T.C. 361, 371, affirmed 226 F. 2d 732, 734 (C.A. 7), certiorari denied, 350 U.S. 1006; Michael Potson, 22 T.C. 912, 929, affirmed sub nom. Bodoglau v. Commissioner, 230 F. 2d 336, 340-341 (C.A. 7); Murray Thompson, 21 T.C. 448, 451, affirmed 222 F. 2d 893, 895 (C.A. 3); Pauline W. Ach, 42 T.C. 114, 126-127, affirmed 358 F. 2d 342 (C.A. 6); Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2). Dividend income received by Burr. During the calendar years 1955 through 1958 Burr diverted funds of Emerald to his personal use. These diversions were made principally by transferring funds from its account at the Manufacturers Trust Company to his personal account. In some instances part of the transferred funds were used to pay for plastics purchased by Emerald and to the extent that the evidence indicates they were so used they have not been treated as having been diverted to Burr's personal use. Other diversions to his personal use included his withdrawal, by check payable to his wife, of $1,100 on January 11, 1955; his withdrawal of $248.89 on October 31, 1955 to make a payment to the Sterling National Bank on his personal loan; the deposit in his savings account in 1956 of two checks received from I.B. West & Co. in repayment of loans made by Emerald; and his withdrawal of $1,900 on October 19, 1956 by check payable to cash which he endorsed. Like the issue relating to the determination of Emerald's profits, the determination of Burr's dividend income is not susceptible of precise computation on this record. Yet, upon the basis of the foregoing evidence, as well as the known balances in Emerald's bank account as of the beginning and end of each of the calendar years 1955, 1956 and 1957, we have been able to arrive at a reasonably satisfactory estimate of Burr's withdrawals of earnings from Emerald, and have found that he received dividend income which should have been reported in the joint returns filed by him and his wife in the amount of $8,000 in 1955, $7,800 in 1956, $7,500 in 1957, and $7,000 in 1958. We are convinced by the evidence that this was the only income received by Burr and his wife that was not reported in their joint returns for the years 1955 through 1958. Inasmuch as they erroneously reported in those returns some "sales commissions" purportedly received by Burr from sales of plastics, the dividend income should be reduced by the amounts of the reported "sales commissions" in determining the amounts of their taxable unreported income for the taxable years. Capital loss deductions. The Burrs claimed deductions of $1,000 for capital losses and capital loss carryovers in their joint returns for the years 1955 through 1958. The Commissioner disallowed these deductions. He now concedes that petitioners sustained capital losses upon their investments in Harjax and in Fashion Tresses, Inc., and that as a result of those losses they are entitled to deduct capital losses of $1,000 in each of the years 1955 through 1958. In the circumstances, it would serve no useful purpose to consider petitioners' contention that Burr sustained an additional capital loss of $16,500 in 1956 since, even if they had proved that they sustained such loss, they would not be entitled to a capital loss deduction for any taxable year before us in excess of the $1,000 which the Commissioner now concedes they are entitled to deduct. Sick Pay Exclusion. The individual petitioners claimed a sick pay exclusion of $2,160 on their 1958 return. During 1958 Burr was an employee of Remington Associates, Inc., and received $10,580 salary from it which was reported in the joint return for that year. On April 7, 1958, he was hospitalized as a result of a heart attack and was discharged from the hospital on May 16, 1958. Thereafter he stayed at home to convalesce for a period of approximately six weeks, and returned to work on or about July 7, 1958. Remington Associates, Inc. continued to pay him his salary of "around 200 some-odd dollars a week" during the period of approximately twelve weeks that he was absent on account of illness. It did not have a formal wage continuation plan. Section 105(d) of the Internal Revenue Code of 1954 permits the exclusion from gross income of up to $100 per week of sick pay. In John C. Lang, 41 T.C. 352, 355, this Court said: * * * while section 105(d) refers only to "wages or payments in lieu of wages," the exclusion provided by that subsection extends only to amounts referred to in section 105(a) - that is, amounts received through accident or health insurance. By virtue of section 105(e) the phrase "amounts received through accident or health insurance" is expressly stated to encompass amounts received under an accident or health plan for employees. It follows that in order to be excluded from gross income under the above provisions, payments constituting wages or payments in lieu of wages must be received by an employee through accident or health insurance, or under an accident or health plan for employees. * * *Section 1.105-5, Income Tax Regs., recognizes that a plan need not grant enforceable rights to an employee, that it may offer different treatment to different classes of employees, and that it may take the form of a "program, policy, or custom having the effect of a plan." But it is provided that if the employee's rights are not enforceable, he must be covered by a plan, and notice or knowledge of the plan must have been reasonably available to him. As we interpret the regulation, in order for there to be a plan, the employer must commit himself to certain rules and regulations governing payment; these rules must be made known to his employees as a definite policy; it is not enough that he merely lets it be known that payments may be made to deserving employees if they are absent from work for illness. The employer's rules, adopted or crystallized by policy or custom, may offer varying treatment for employees, but the rules must be determinable before the employee's sickness arises. Petitioners contend that the salary payments made by Remington Associates, Inc. to Burr during his absence on account of illness were made pursuant to an established practice of the corporation which constituted a health plan for employees within the meaning of section 105. Burr testified that Remington Associates, Inc. did not have a formal wage continuation plan, but that it had "over the period of years" always paid the salaries of employees during the time they were absent on account of illness. No evidence was produced showing that its employees were aware that this was the practice, policy or custom of the corporation, no specific instance where payments were made to an employee, other than Burr, during absence on account of illness was disclosed, and no records of the corporation showing that it followed the practice of making such payments to all of its employees were produced. Cf. Nickamp v. United States, 240 F. Supp. 195, 197 (D.C. Mo.); Estate of E. W. Chism, 322 F. 2d 956, 961-962 (C.A. 9); Estate of Leo P. Kaufman, 35 T.C. 663, affirmed 300 F. 2d 128 (C.A. 6). In the Kaufman case, at page 667, this Court concluded that testimony of a taxpayer that it was always the policy of a corporation to continue the pay of employees when they were ill, standing alone, was not sufficient to establish that a "plan" existed within the meaning of section 105. Since we have no confidence in Burr's unsupported conclusory testimony in this regard, we reach a like conclusion here and hold that petitioners have not sustained their burden of proving that the Commissioner erred in disallowing the sick pay exclusion claimed in the joint return for 1958. Deductions for Contributions. In their joint returns the Burrs claimed deductions for contributions in the amount of $400 for 1955, $786 for 1956, $930 for 1957, and $930 for 1958. In determining the deficiencies the Commissioner disallowed $340 of the amount claimed for 1955, and all of the amounts claimed for 1956, 1957, and 1958 for lack of substantiation. Petitioners did not produce any evidence showing that the Commissioner erred in his determinations for the years for 1955 and 1956, and for lack of such evidence those determinations are approved. Petitioners did produce evidence showing that the Burrs made contributions totalling $450 during the year 1957 and $680.84 during the year 1958, and they are entitled to deductions of those amounts. Amounts claimed by them in their returns for 1957 and 1958 for contributions in excess of those amounts are disallowed for lack of substantiation. Deductions for Interest. In their joint returns the Burrs claimed deductions for interest paid in the amount of $373.97 for 1955, $1,305.60 for 1956, $1,279.59 for 1957, and $1,018.75 for 1958. In determining the deficiencies the Commissioner disallowed for lack of substantiation $71.45 of the amount claimed for 1955, $671.93 of the amount claimed for 1956, $281.20 of the amount claimed for 1957, and $150.17 of the amount claimed for 1958. Petitioners have produced no evidence showing that respondent erred in his determinations for the years 1955, 1956 and 1957, and for those years those determinations are approved. For the year 1958, petitioners produced evidence showing a payment of interest on a mortgage loan in the amount of $948.19, and they are entitled to a deduction of that amount. The remainder of the $1,018.75 claimed as a deduction for interest paid in their 1958 return, or $70.56, is disallowed for lack of substantiation. Deductions for Taxes. In their joint returns the Burrs claimed deductions for taxes paid in the amount of $507.24 for 1955, $978.67 for 1956, $1,161.67 for 1957, and $1,659.52 for 1958. In determining the deficiencies the Commissioner disallowed for lack of substantiation $123.99 of the amount claimed for 1955, $478.39 of the amount claimed for 1956, $370.58 of the amount claimed for 1957, and $176.14 of the amount claimed for 1958. Evidence produced by petitioners with reference to taxes paid does not show that the Commissioner erred in his determinations for the years 1955, 1956 and 1957. For the year 1958 he allowed a deduction for real estate taxes of $654.66. The evidence shows that the amount of real estate taxes paid by Burr in 1958 was $688.80. Petitioners are therefore entitled to a deduction for that year of $1,517.52, or $34.14 more than the Commissioner allowed. Miscellaneous Deductions. We have set forth in our findings the amounts claimed by Burr and his wife in their returns for the years 1955 through 1958 for medical expenses, travel expenses, and dues and subscriptions, and the amounts disallowed by the Commissioner in determining the deficiencies. Petitioners did not produce any evidence showing that the Commissioner erred in disallowing all of the amounts claimed for medical expenses in their 1955 and 1956 returns, or that their expenses for medicines and drugs and other medical expenses for the years 1957 and 1958 exceeded the amounts determined by the Commissioner. However, in view of our determination that their income for 1957 and 1958 was in excess of that reported in their returns adjustments in the amounts allowable for medical expenses for those years will be made under Rule 50. Petitioners also did not produce any evidence showing that the Commissioner erred in disallowing deductions claimed for travel expenses in their returns for the years 1957 and 1958 and the amount claimed for dues and subscriptions for the year 1957. Our decision with respect to these items is for the Commissioner. Legal expense. At the trial petitioners introduced in evidence a check in the amount of $2,500, dated November 19, 1958, payable to Liebowitz, Cobert & Deixel, drawn by Burr on his account at the Manufacturers Trust Company. Burr testified that this amount represented a retainer paid "in this case" to a law firm. No deduction was claimed in the Burrs' 1958 joint return in respect of this item, nor was any issue raised in connection with this payment in any pleading or amendment thereto in this proceeding. On brief petitioners contend that they are entitled to a deduction of $2,500 for 1958. This Court has often held that it will not, under its Rules of Practice, 1 consider issues which are not raised by pleadings. J. William Frentz, 44 T.C. 485, 490-491; Eleanor C. Shomaker, 38 T.C. 192, 201; Frank Polk, 31 T.C. 412, 415, affirmed 276 F. 2d 601 (C.A. 10); Lynne Gregg, 18 T.C. 291, 303, affirmed per curiam 203 F. 2d 954 (C.A. 3); Samuel E. Hirsch, 16 T.C. 1275, 1279; The Maltine Company, 5 T.C. 1265, 1275; and Factor v. Commissioner, 281 F. 2d 100, 122-125 (C.A. 9), affirming a Memorandum Opinion of this Court, certiorari denied 364 U.S. 933. In the circumstances we decline to consider the contention that the individual petitioners are entitled to a deduction of $2,500 for 1958. *183 Fraud. Respondent determined that Jack and Myn Burr and Emerald were liable for the taxable years involved for the addition to tax imposed by Section 6653(b) of the Internal Revenue Code of 1954. This section provides that "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The evidence discloses underpayment of tax both by Burr individually and by Emerald and that the person responsible for such underpayment in both instances was Burr. He was the president and sole stockholder of Emerald and any intention by him to evade tax while acting for or on behalf of Emerald is to be imputed to that corporation. He was responsible for its failure to file Federal income tax returns for its taxable years. He knew that acting in its name he had sold plastics and that it had realized profits from such sales which should have been reported in returns filed by it. He testified that he kept a record of those profits in a little book which he was unable to find, and that the amounts which he*184 reported as "commissions" represented all of the profits realized on the sales. We do not believe that testimony. The evidence reveals that the profits realized on the sales was substantially in excess of the amounts reported in his individual returns and convinces us that Burr, with the intention of evading taxes, failed to keep records from which the profit on sales he made on behalf, and in the name, of Emerald, could be determined. 2 It also discloses that during the taxable years he made withdrawals from the account of Emerald at the Manufacturers Trust Company; that a substantial portion of the funds withdrawn were diverted to his personal use; and that he failed to report the funds so diverted in the joint returns filed by him and his wife. 2 This and other evidence convinces us that part of the understatements of income required to be shown on the returns of Emerald for the fiscal years ended May 31, 1955 through May 31, 1958, and on the returns of Burr and his wife for the calendar years 1955 through 1958, was due to fraud with intent to evade tax and we have made findings to this effect. We hold that the Commissioner did not err in determining that both Emerald and Jack*185 and Myn Burr were liable for the 50 percent addition to tax imposed by Section 6653(b). Decisions will be entered under Rule 50. Footnotes1. Tax Court's Rules of Practice, Rules 7 and 17↩.2. Although it was necessary for us to determine the amounts of unreported income by making best estimates or approximation upon the record, the record contains clear and convincing evidence that there was unreported income for each year to a substantial extent, wholly apart from the amount thereof.↩